UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o U.S. Attorney's Office<br>601 D Street, NW<br>Washington, DC 20530,<br><br>    Plaintiff,<br><br>    v.<br><br>$1,250,000 IN UNITED STATES CURRENCY<br>BEING HELD BY U.S. FINANCIAL<br>INSTITUTION 1<br><br>$200,000 IN UNITED STATES CURRENCY<br>BEING HELD BY U.S. FINANCIAL<br>INSTITUTION 2,<br><br>    Defendants | Civil A. No. |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia, which brings this verified complaint for forfeiture in a civil action *in rem*, in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure, against: $1,250,000 in United States Currency held by U.S. Financial Institution 1 ("Defendant Property 1") and $200,000 in United States Currency held by U.S. Financial Institution 2 ("Defendant Property 2"), and alleges as follows:

### NATURE OF THE ACTION AND DEFENDANT *IN REM*

1. This *in rem* forfeiture action arises out of an investigation by Homeland Security Investigations ("HSI"). Specifically, the United States is investigating a procurement network based in Russia for violating U.S. sanctions against the Islamic Republic of Iran by brokering the

sale of aircraft to intermediaries with knowledge that the aircraft would be transferred to and for the benefit of Iran and Mahan Air, a designated Iranian airline, in violation of U.S. law.

2.      This action seeks to forfeit the Defendant Property which were funds intended for the purchase of U.S. origin aircraft for the benefit of Iran, Mahan Air, the IRGC and the IRGC-QF, each of which has been designated by the U.S. Treasury Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.

3.      The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it is property that was involved in, and/or is traceable to property that was involved in, a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), that occurred when RUSAVIAINVEST caused U.S. Financial Institutions 1 and 2 to facilitate the payment of U.S. dollars in furtherance of the transport of U.S. aircraft to sanctioned airline, Mahan Air in Iran, with the intent to promote a specified unlawful activity, *viz.,* a violation of the Export Administration Regulations, 15 C.F.R. Parts 730- 774). *See* 18 U.S.C. § 1956(c)(7)(A) and (B)(v)(II).

4.      The Defendant Property is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property that was involved in, and/or is traceable to property that was involved in, a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), that occurred when RUSAVIAINVEST caused U.S. Financial Institutions 1 and 2 to facilitate the payment of U.S. dollars in furtherance of the transport of U.S. aircraft to sanctioned airline, Mahan Air in Iran, with the intent to promote a specified unlawful activity, *viz.,* a violation of the Economic Control Reform Act, International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705.

## JURISDICTION AND VENUE

5.   This Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 U.S.C. §§ 1345 and 1355.

6.   This Court has *in rem* jurisdiction over the Defendant Funds and venue pursuant to 28 U.S.C. §§ 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia. Specifically, the Defendant Entities and co-conspirators failed to seek or obtain licenses from the Department of the Treasury's ("Treasury's") Office of Foreign Asset Control ("OFAC"), which is located in Washington, D.C., to conduct transactions through the United States for which licenses were required under United States law.

## FACTS GIVING RISE TO FORFEITURE

**A.   Background**

<u>Export Control Reform Act</u>

7.   The Export Control Reform Act ("ECRA"), 50 U.S.C. § 4801 *et seq*., grants the President of the United States the authority, among other things, to "control . . . the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons . . . relating to" specific categories of items and activities. 50 U.S.C. § 4812(a). ECRA further grants the Department of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. §§ 4813-4815.

<u>Export Administration Regulations</u>

8.   The Department of Commerce controls the export of certain items, including commodities, software, and technology, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774. The EAR restricts the export of items for national security, foreign policy and other interests of the United States as

3

reflected in international obligations and arrangements. 15 C.F.R. § 730.6. It also restricts exports of items that could make significant contributions to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. 15 C.F.R. § 742.4. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another. *See* 15 C.F.R. § 730.7.

<u>Commerce Control List and Export Control Classification Numbers</u>

9. Sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"). 15 C.F.R. part 774. Items on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export control requirements depending upon destination, end use, and end user. Aircraft and aircraft parts and components are specified items under ECCN 9A991 and are controlled for anti-terrorism purposes as set forth more fully below. 15 C.F.R. part 774.

<u>Iran-Related Export Controls Under the EAR</u>

10. Pursuant to Section 746.7 of the EAR, the Department of Commerce "maintains licensing requirements on exports and reexports to Iran under the EAR as described in paragraph (a)(1) of this section or elsewhere in the EAR (*See, e.g.,* § 742.8 – Antiterrorism: Iran)." 15 C.F.R. § 746.7 (emphasis added).

11. Section 742.8 of the EAR provides that "[a] license is required for anti-terrorism purposes to export or reexport to Iran an item for which AT column 1 or AT column 2 is indicated in the Country Cart column of the applicable ECCN . . . ." *See also* 15 C.F.R. § 746.7(a)(1).

12. ECCN 9A991 "Aircraft" indicates that "AT applies to [the] entire entry" and that anti-terrorism controls apply under AT Column 1 of the Country Chart. *See* 15 C.F.R. part 774,

4

Supp. No. 1. Section 764.7(c) further provides that "[n]o license exceptions[1] may be used for exports or reexports to Iran." Thus, exports and reexports to Iran of aircraft classified under ECCN 9A991 and controlled for anti-terrorism (AT) reasons require a license, and no license exceptions are available.

<u>Temporary Denial Order</u>

13. The Department of Commerce may issue a TDO, temporarily denying export privileges, if the Department of Commerce determines such an order is "necessary in the public interest to prevent an imminent violation of the EAA,[2] the EAR, or any order, license or authorization issued thereunder." 15 C.F.R. § 766.24(b). A TDO is issued for 180 days and can be renewed upon determination that such a renewal is necessary to prevent continued violations. *Id*. at § 766.24(d).

14. On March 17, 2008, the Department of Commerce issued a TDO imposing export restrictions upon Mahan Air. This TDO has been renewed continuously and remains in effect. 87 Fed. Reg. 30,173 (May 18, 2022).

<u>General Prohibition 10</u>

---

1    A "License Exception" is "an authorization" in the EAR that allows the "export or reexport under stated conditions [of] items subject to the Export Administration Regulations (EAR) that would otherwise require a license[.]" 15 C.F.R. § 740.1(a).

2    The Export Administration Act of 1979, as amended, or EAA, is the predecessor statute to ECRA. *See* 50 U.S.C. §§ 4601-4623 (Supp. III 2015). The EAA lapsed on August 21, 2001 but was kept in force through the President's authority under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq*. With ECRA's enactment on August 13, 2018, the EAA was partially repealed. Regulations and order issued under the authority of the EAA and IEEPA continue in effect until modified, superseded, set aside or revoked through action undertaken pursuant to the authority provided under ECRA. 50 U.S.C. § 4826.

15. The EAR also sets forth General Prohibition 10, which prohibits the continued use of an item that was known to have been exported or reexported in violation of the EAR. 15 C.F.R. § 736.2(b)(1) (General Prohibition 10). The provision provides:

> General Prohibition 10 – Proceeding with transactions with knowledge that a violation has occurred or is about to occur (Knowledge Violation to Occur). You may not sell, transfer, export, reexport, finance, order, buy, remove, conceal, store, use, loan, dispose of, transport, forward, or otherwise service, in whole or in part, any item subject to the EAR and exported or to be exported with knowledge that a violation of the Export Administration Regulations, the Export Administration Act or any order, license, License Exception, or other authorization issued thereunder has occurred, is about to occur, or is intended to occur in connection with the item. Nor may you rely upon any license or License Exception after notice to you of the suspension or revocation of that license or exception. There are no License Exceptions to this General Prohibition Ten in part 740 of the EAR.

Notably, no license exceptions are available for General Prohibition 10.

**B.    Relevant Entities**

   **i.    Government of Iran**

16. On January 19, 1984, the United States designated Iran as a state sponsor of terrorism. *See* https://www.state.gov/reports/country-reports-on-terrorism-2020/iran/. For 2020, the most recent year for which Country Reports on Terrorism are available, the State Department concluded that "Iran continued its terrorist-related activity in 2020, including support for Hizballah, Palestinian terrorist groups in Gaza, and various terrorist and militant groups in Iraq, Syria, and elsewhere throughout the Middle East." *Id.* The State Department further found that "Iran used the Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region," and that "the IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad." *Id.* To date, the United States has not delisted Iran as a state sponsor of terrorism. *See* https://www.state.gov/state-sponsors-of-terrorism/.

### ii. Islamic Revolutionary Guard Corps

17. The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.

18. The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking." https://home.treasury.gov/news/press-releases/tg1718. According to OFAC, "[t]he IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses." https://home.treasury.gov/news/press-releases/sm703. The IRGC and IRGC-QF use a network of shipping, transportation and front companies to hide their involvement in the sale and shipment of Iranian oil as well as their transfer of weapons.

19. The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities and fund there transfer of weapons, ammunition, and military personnel to various locations around the world. *See* https://home.treasury.gov/news/press-releases/sm885; *see also* https://home.treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad."). The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." https://home.treasury.gov/news/press-releases/sm885.

20. On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm. In part, OFAC found that "[t]he Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)." *Id.* On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm0177.

21. On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/. The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism." *Id.* On April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF. *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html. That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." *Id.* On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA. *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/

documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

22. The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States. The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

    a. In likely retaliation for the death of former IRGC-QF commander Qasem Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed plot to commit murder-for-hire and provide material support to a transnational murder plot targeting former National Security Advisor John Bolton, https://www.justice.gov/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

    b. In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/.

    c. In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010). IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack. *Id.*

23. Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and abroad. Indeed, the entire purpose of the IRGC and IRGC-QF's campaigns of terror are to thwart

the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries. *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States"). These terrorist activities undertaken in foreign commerce plainly have a domestic effect on the United States.

### iii. Mahan Air

24. Mahan Air is an Iranian Airline founded in 1992 to provide passenger and freight services domestically and internationally. *See* https://www.mahan.aero/en/about-mahanair. As previously discussed, on March 17, 2008, the Department of Commerce issued a TDO against Mahan Air "to prevent an imminent violation of the [EAR]" involving the transfer and attempted transfer of multiple Boeing 747-300 aircrafts to Iran in violation of the EAR. *See* 84 Fed. Reg. 30,173 (May 18, 2022). The TDO remains in effect. *See id.*

25. Specifically, the renewed Mahan Air TDO prohibits Mahan Air and related named entities from directly or indirectly participating in any way in any transaction involving any item subject to the EAR or any activity subject to the EAR, including but not limited to:

> Carrying on negotiations concerning, or ordering, buying, receiving, using, selling, delivering, storing, disposing of, forwarding, transporting, financing, or otherwise servicing in any way, any transaction involving any item exported or to be exported from the United States that is subject to the EAR, or engaging in any other activity subject to the EAR; or
>
> Benefitting in any way from any transaction involving any item exported or to be exported from the United States that is subject to the EAR, or from any other activity subject to the EAR.

*Id.* at 30,181.

26. In addition, among other prohibitions, no person may, directly or indirectly, do any of the following:

> Export, reexport, or transfer (in-country) to or on behalf of a Denied Person any item subject to the EAR;

> Take any action that facilitates the acquisition or attempted acquisition by a Denied Person of the ownership, possession, or control of any item subject to the EAR that has been or will be exported from the United States, including financing or other support activities related to a transaction whereby a Denied Person acquires or attempts to acquire such ownership, possession or control[.]

*Id.* at 30,181.

27. On or about October 12, 2011, OFAC added Mahan Air to the Specially Designated Nationals and Blocked Persons ("SDN") List pursuant to E.O. 13224 for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)." *See* https://home.treasury.gov/news/press-releases/tg1322; 76 Fed. Reg. 64,427 (Oct. 18, 2011). According to OFAC, Mahan Air provided travel services to IRGC-QF personnel, facilitated IRGC-QF arms shipments, and transported funds used to facilitate the purchase of controlled goods by the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/tg1322. Mahan Air also provided transportation services to Hizballah, a Lebanon-based designated FTO. *Id., see also* https://home.treasury.gov/news/press-releases/sm484.

28. Since its designation, Mahan Air has used various intermediary companies and individuals, "to negotiate sales contracts, and these companies deliberately fail to disclose Mahan Air as the end-user of the purchased equipment." *See* https://home.treasury.gov/news/press-releases/jl0395. These intermediaries use various means to facilitate Mahan Air's operations including by providing false documentation to obtain maintenance services for the Mahan Air

fleet, providing parts and services to the Mahan Air fleet, and providing sales, financial, administrative, and marketing services to Mahan Air's freight reception and handling. *See e.g., id.*; https://home.treasury.gov/news/press-releases/sm0395; https://home.treasury.gov/news/press-releases/sm484; https://home.treasury.gov/news/press-releases/sm853; https://home.treasury.gov/news/press-releases/sm1014.

      iv.    **Rusaviainvest OOO and Rusaviainvest OU**

29.    RusAviaInvest OOO is an aircraft finance company organized in the Russian Federation. Its principal place of business is Shchyolkovo, Russia. RusAviaInvest OU is an affiliate of Rusaviainvest OOO organized in Estonia and located in Tallinn, Estonia. Both entities are owned and or controlled by Andrey Konstantinovich Vorobyev ("Vorobyev").

      v.    **Aircraft**

30.    <u>Airbus A310</u>: The Airbus A310s are powered with U.S.-origin engines that are subject to the EAR and classified under Export Control Classification ("ECCN") 9A991.d. The Airbus A310s contain controlled U.S.-origin items valued at more than 10 percent of the total value of the aircraft and as a result are subject to the EAR. They are classified under ECCN 9A991.b. The export or reexport of these aircraft to Iran requires U.S. Government authorization pursuant to Sections 742.8 and 746.7 of the Regulations." https://efoia.bis.doc.gov/index.php/documents/export-violations/export-violations-2015/1118-e2505/file.

31.    <u>British Aerospace RJ-85</u>: "The BAE Avro RJ-85 is powered by U.S.-origin engines that are subject to the Regulations and classified under ECCN 9A991.d. The BAE Avro RJ-85 contains controlled U.S.-origin items valued at more than 10 percent of the total value of the aircraft and as a result is subject to the EAR regardless of its location. The aircraft is classified

under ECCN 9A991.b, and its export or re-export to Iran requires U.S. Government authorization pursuant to Sections 742.8 and 746.7 of the Regulations." https://efoia.bis.doc.gov/index.php/documents/export-violations/export-violations-2015/1118-e2505/file.

**C.    RELEVANT EVENTS**

32. On or around October 27, 2016, Rusaviainvest OOO entered into a contract with a flag carrier airline ("Airline 1") to purchase a U.S.-origin aircraft, specifically, one Airbus A310-300 bearing Manufacture Serial Number ("MSN") 706 ("MSN 706") for $2,000,000 U.S. dollars ("USD").

33. On or around October 27, 2016, Rusaviainvest OOO entered into a second contract with Airline 1 to purchase three British Aerospace Avro RJ85s bearing MSNs E2309, E2312, andE2319, as well as three aviation engines, an auxiliary power unit, and spare parts, for a total of $8.4 million USD.

34. On November 1, 2016, Airline 1 issued an invoice to Rusaviainvest, Ltd. for $2,000,000 in connection with the sale of MSN 706. Airline 1 addressed the invoice to the attention of "Director General A.K. Vorobyev."

35. On November 1, 2016, Airline 1 issued a second invoice to Rusaviainvest, Ltd. for $8.4 million in connection with the sale of three Avro Model RJ-85 aircraft, three aviation engines, an auxiliary power unit, and spare parts. Airline 1 again addressed the invoice to the attention of "Director General A.K. Vorobyev."

36. Between on or about July 11, 2016 and on or about March 3, 2017, Vorobyev made ten (10) U.S. dollar payments totaling $3,560,000 from Rusaviainvest OOO or Rusaviainvest OU

13

to Airline 1 representing payments for MSN 706, MSN E2309, MSN E2312, and MSN E2319. Each of these payments transited through U.S. correspondent banks.

37. On or about March 30, 2017, Rusaviainvest OOO initiated a wire transfer of $200,000 to Airline 1 for MSN 706. This payment passed through U.S Financial Institution 1. On or about March 31, 2017, the U.S. Department of the Treasury Office of Foreign Asset Control ("OFAC") blocked this payment. On or about April 3, 2017, Rusaviainvest OOO's bank in Russia ("Russian Bank 1") informed the company and Vorobyev that this payment had been "blocked per OFAC."

38. On or about March 31, 2017, Rusaviainvest OOO initiated a second wire transfer to Airline 1 for $1,000,000. This payment passed through U.S Financial Institution 1. On or about April 3, 2017, OFAC blocked this second payment. Russian Bank 1 informed Russaviainvest OOO and Vorobyev that "this payment was blocked under the global terrorism sanctions regulations."

39. On or about April 10, 2017, Rusaviainvest OOO initiated a third wire transfer to Airline 1 for $200,000. This payment passed through U.S Financial Institution 2. On or around April 11, 2017, OFAC blocked this third payment. Russian Bank 1 advised the company and Voroboyev that "under regulations issued by the US Office of Foreign Assets Control (OFAC), please be advised that the funds have been placed into a blocked account..."

40. On or about April 25, 2017, OFAC blocked a fourth wire transfer for $50,000 from a different account, Rusaviainvest OU (Finland), to Airline 1. This payment passed through U.S Financial Institution 1.

41. Between on or about April 24, 2017 and on or about May 19, 2017, Vorobyev and Rusaviainvest OOO filed applications with OFAC to obtain licenses for Rusaviainvest OOO's payments that were blocked on or around March 31, 2017, April 3, 2017, and April 11, 2017.

Vorobyev and Rusaviainvest OOO did not file a license application for the April 25, 2017 blocked payment from Rusaviainvest OU (Finland). OFAC denied all three applications.

42. On or about July 25, 2017, Rusaviainvest OOO and Vorboyev received information about Iranian nationals and copies of Iranian passports from an Iranian entity indicating that Rusaiviainvest OOO and Vorboyev had direct knowledge that the end user of the aircraft was Iran and the individuals scheduled to accept delivery of MSNs E2309, E2312, and E2319 were each Iranian nationals, one of which was associated with Mahan Air and weapons smuggling.

43. Between on or about July 1, 2020 and on or about August 1, 2020, after passing through a Tajikistan-based Airline ("Airline 2") and a Kyrgyzstan-based airline ("Airline 3"), MSNs 706, E2309, E2312, and E2319, were each registered to Mahan Air in Iran under tail numbers EP-MED, EP-MEA, EP-MMS, and EP-MEB, respectively. On or about July 2023, EP-MED was subsequently transferred to Iran Airtour in July 2023.

44. Any transaction involving sanctioned Iranian Airline Mahan Air would require a license from OFAC. Neither Rusaviainvest nor Vorobyev received a license to make payments through the U.S. financial system in furtherance of the above-referenced transactions.

45. In addition, exporting U.S. origin items to Mahan Air would require licenses from the U.S. Department of Commerce, Bureau of Industry and Security ("BIS"), which is also located in Washington, D.C because Mahan Air is subject to a Temporary Denial Order ("TDO") which prohibits any person from facilitating the export or sale/purchase of U.S. technology to Mahan Air.[3]  I am unaware of any such licenses being sought or obtained.

---

[3] https://www.federalregister.gov/documents/2023/05/10/2023-09921/mahan-airways-mahan-tower-no-21-azadegan-st-ma-jenah-exp-way-tehran-iran-pejman-mahmood

46. According to reliable open-source aviation databases, three Airbus A319s, MSN 1654, MSN 1679, and MSN 1753, were registered to Asia Sky Lines prior to being exported to Iran, where they were registered to Tehran Airlines under tail numbers EP-THD, EP-THE, and EP-THF, respectively, between February 2019 to December 2019. All three aircraft were registered to Iran Air on or around January 29, 2020 under tail numbers EP-IEP, EP-IEQ and EP-IER, respectively.

**COUNT ONE – FORFEITURE**
18 U.S.C. § 981(a)(1)(C)

1. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 46 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C).

2. The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it is property that was involved in, and/or is traceable to property that was involved in, a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), that occurred when RUSAVIAINVEST caused U.S. Financial Institutions 1 and 2 to facilitate the payment of U.S. dollars in furtherance of the transport of U.S. aircraft to sanctioned airline, Mahan Air in Iran, with the intent to promote a specified unlawful activity, *viz.,* a violation of the Export Administration Regulations, 15 C.F.R. Parts 730- 774). *See* 18 U.S.C. § 1956(c)(7)(A) and (B)(v)(II).

**COUNT TWO – FORFEITURE**
18 U.S.C. § 981(a)(1)(A)

1. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 46 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(A).

2.  The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property that was involved in, and/or is traceable to property that was involved in, a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), that occurred when Rusaviainvest OOO, Rusaviainvest OU and Vorobyev caused a U.S. financial institution to facilitate the payment of U.S. dollars in furtherance of the transport of U.S. aircraft to sanctioned airline, Mahan Air in Iran, with the intent to promote a specified unlawful activity, *viz.,* a violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705.

* * *

WHEREFORE, the plaintiff prays that all persons who reasonably appear to be potential claimants with interests in the Defendant Property be cited to appear herein and answer the complaint; that the defendant property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States Marshal dispose of the defendant property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

Dated: August 4, 2025
       Washington, D.C.

                          Respectfully submitted,

                          JEANINE FERRIS PIRRO
                          United States Attorney

                          By:  /s/ *Rajbir Datta*
                                RAJBIR DATTA
                                  N.Y Bar 5206073
                                Assistant United States Attorney
                                601 D Street, N.W.
                                Washington, D.C. 20579
                                (202) 252-7687 (Datta)
                                Rajbir.Datta@usdoj.gov

## **VERIFICATION**

I, Brent Talaga, a Special Agent with Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this XX day of July 2025.


  /s/ Brent Talaga
Special Agent Brent Talaga
Homeland Security Investigations